Good morning, your honors. May it please the court, Omar Khan of WilmerHale for the appellant, Mr. Garcia. I'd like to reserve three minutes of my time for rebuttal. As the court knows, this is a case about a prisoner, Mr. Garcia, who spent two and a half months in solitary confinement and also was denied the benefit of a routine sort of convenience bed sale program that was made available to prisoners similar situated to him. The district court improperly granted summary judgment on three separate claims. First, a set of claims relating to senior prison officials who investigated a claim by him that he had been subjected to a claim that prison officials made that he had been subjected to excessive force and then both sent him to solitary confinement and extended the term of the solitary confinement. That's defendants Suglich, Contreras, and Cortez. The district court also granted summary judgment with respect to certain prison officials who sent Mr. Garcia to solitary confinement on the grounds that he had refused a housing assignment, but both all those officials, particularly the senior officials who were investigating that issue, knew and understood that the initial decision to send him to improper housing assignment was improper. The third set of claims was for being denied placement in the convenience housing program with his brother. The district court improperly granted summary judgment to those three sets of claims, and then there was also a trial and a jury verdict with respect to certain junior prison officials. With respect to those prison officials, the argument or position that we're taking on appeal is that the jury's verdict was not substantiated by substantial evidence, and the sole basis that we are articulating on appeal is that the evidence was legally insufficient because the government's defense was that the prison policy served a legitimate correctional goal, when in fact, the policy under this court's precedent did not serve a legitimate correctional goal, and there was no evidence in the record to suggest that it did, either generally or with respect to Mr. Garcia specifically. For those reasons, and I'll sort of go through them all in some more detail, Mr. Garcia is seeking from this court judgment as a matter of law with respect to the claims that went to trial and were subject to the jury verdict. In the alternative, Mr. Garcia would also be satisfied that the remand of the district court to retry those claims along with the claims that were the subject of the summary judgment proceedings. I'll start with the jury verdict and the challenge of the jury verdict first. As I said earlier, the government's theory at trial was that it was acceptable, and the jury was told that it was acceptable for Mr. Garcia to be placed in solitary confinement. So this claim is against Vasquez, Stewart, and Chance, right? Correct. Where was there evidence that they could make the decision to place him in ADSEG? So I thought perhaps what the jury found is that they couldn't have been liable for retaliation because they didn't make the decision to put him in ADSEG. If, first of all, the record has to be sort of construed as a whole, and there was evidence in the record that they submitted declarations and memorandum to Lieutenant Elias, who ultimately did make the decision. So they were sort of initiating the decision-making process. But if they couldn't make the decision themselves, then can't we affirm the jury verdict on the idea that they weren't the relevant decision-maker ultimately? Ultimately, that would be inconsistent with the evidence as it sort of came out of trial, because they all agreed that they had indicated to Lieutenant Elias that he had made claims of excessive force. Well, they're not the ones deciding, I mean, you attack the policy as not sufficiently justified for pineological reasons. These guys in the cell block aren't making that decision, are they? The policy they purport to apply, which we'll get to, because I'm not sure it's as illogical as alleged, but they're not the guys who get to decide, well, the prison system shouldn't have a policy, or this prison shouldn't have a policy of sending people who have made complaints of excessive force elsewhere. But there was nothing in their submission to Lieutenant Elias, nothing about Mr. Garcia's specific... Well, they just said he alleged excessive force, right? And then it's Elias's decision whether that matters and whether to apply the policy, or maybe it's even someone above Elias, but these guys aren't the ones who put him in EXEC. I would dispute the characterization that they're not the ones who put him in. I mean, they initiated the process by which... Well, they knocked over the first domino. That's right. But the policy you're talking about is not up to the guy in the cell block. It is up to the guy in the cell block to... They invoked the policy, if I can put it that way, right? So they invoked the policy to say... Well, they started the process of invoking the policy, so couldn't the jury just say, we're not going to blame these guys for this, it would have to be someone else? I don't think the policy was... There was no evidence of trial at that level of detail with respect to the various hierarchies of who was responsible for implementing the policy at what level. Was there any evidence by your client that the prison did not, in fact, have a practice of removing somebody who had made a complaint of excessive force? If I understood your question correctly, Judge Clifton, I think the answer is no. So if it's accepted that this is their practice, you can attack that as not being sufficiently grounded in good peniological practice and so forth. But if it's the practice, then what are the guy in the cell block, how is he responsible for the decision? If he says there's been a complaint of excessive force, what happens after that seems to be out of that person's hands. And Judge Friedland's question is, we try to figure out what the jury verdict is based on, given the... I mean, any reasonable basis for the jury to reach that verdict gets upheld, and I can't see why that isn't a plausible reason why the jury says, these low-level guys, they're not making the decision that hurt your client, so we're not going to hold them accountable for it. Let me answer that in two ways. So first, I don't think, and my colleague will help the court on this, but I don't think... I'm sure she'll have something to tell us. I don't think the evidence at trial was sufficient for the jury to conclude that these guys were so low-level that they had no ability to sort of talk about the policy or indicate to their superior... Well, if there was no evidence that this wasn't a practice, why should anybody think the guy on the cell block has that call? I mean, if there was no evidence, for example, and I understand your client's difficulties in presenting the case, per se, and so forth, but unless you could say, look, George Smith over in cell block C complained of excessive force, and he wasn't removed to add seg, if it appears to be that this is the prison's practice, then it's hard for me to see how the jury can decide, well, we're going to blame the guys in the cell block for that practice. You know, I think that at the end of the day, the second part of what I was going to say was that it all goes to whether or not there was a legitimate penological purpose. But if what you're challenging is the prison's policy, then shouldn't you have sued the policy maker? You sued the warden at that point, right? Not the low-level guy. Well, everybody up and down the chain is responsible for implementing the policy and ensuring that there is a legitimate penological purpose for the adverse action that was taken against Mr. Garcia. And so in this instance, sort of the junior officials who sort of initiated the process or tipped over the first domino, so to speak, it was just as much their obligation to ensure a proper penological purpose. What's illogical about it? You've got somebody who's complained of excessive force. You want to leave them in the same place with the same jailers who were responsible for the alleged excessive force? So that, I think, is at the heart of what the government is basically saying by citing tomorrow and some other sort of in 9th Circuit cases. And here's what I would say on that point. The key difference here is that there was no evidence whatsoever sort of in the record that the policy as a general matter serves any penological purpose. I think I just articulated it. I mean, from the perspective of the prison, you've got a real downside. If you leave the person who's made this complaint in exactly the same circumstances, you're inviting a world of hurt afterwards, the possibility of abuse by the same people that are subject to the complaint, the possibility the prisoner will contend that there was further abuse. I mean, the argument kind of writes itself. I complain and they left me exactly where I was, making me vulnerable and tainting any investigation thereafter. I mean, for me, it makes enormous sense. It may not be the best policy, but the logical connection is not a hard one to make. And what I would say is if there were evidence in the record that that was the purpose of policy or there was historical information that in the past such prisoners' complaints had sort of elevated or escalated. If I can figure that out, why does there need to be evidence saying that was the thought process of the person that did it? I mean, you have to demonstrate that it didn't serve a peniological purpose. And what evidence was there that it didn't? And so that's what's required in Amaro. And then if we flip to the summary judgment context, the presumptions reverse. And so they favor Mr. Garcia. And in that context, the fact that this policy was instituted, but there was no specific reasons with respect to Mr. Garcia, actually helps him because it justifies the inference that this was pretextual, that the use of the policy to retaliate against him for his grievances in the absence of any reasons for why Mr. Garcia specifically either caused or his actions resulted in safety or that gives rise to an inference that... I can figure them out. Tell me what's wrong about the logic I just offered up. And I think maybe if I could distinguish sort of the two uses of the policy, and I think that's important. So first, the policy with respect to the jury trial verdict, our view is that the policy is both does not serve a rational basis, arbitrary, capricious, and that if you're going to use the policy, you have to provide specific evidence. But in the context of the summary judgment decisions, the cases are clear. So there's Bruce versus Yist and Jones that say that the policy, the resort to generalized policy is not sufficient to withstand a summary judgment motion because in that summary judgment... You're still not giving me a reason why the policy is illogical. I mean, like I say, the case is hard one to draw. You give me all sorts of theories about who's responsible for drawing the lines, but I can draw the lines myself. And you haven't explained why the lines don't connect the way I suggested. Right. And I'm going to come back. So now I'm coming back to... Well, we're using up most of your time, and I'm still wondering where we're going to get the substance. I mean, you asked for three minutes, and we're now under three minutes. So is there substantively any reason for me to think that this is not peneologically motivated? Well, in the context of summary judgment, the cases are clear that it has to be specific. But in the context of the jury... Still not about substance. Right. So the policy is illogical because it's punishing the victim. So the first thing out of the prisoner's mouth is excessive force, and then he's thrown into solitary confinement for, in this case, first 45 days and then another 60 days. And the idea that it doesn't serve any of the functions that are articulated in Section 3335. So it's not for his own safety or the safety of the other inmates. It's not for institution security. Prisoners who are at risk. I mean, a couple days ago, there was news coverage of the fact that we had the case involving L.A. County deputies. You're not from L.A., so it probably wouldn't have hit your radar screen. But we're dealing with the possibility of sheriff's deputies. They've been sentenced to serve time. They're still out on bail pending appeal. But you read about law enforcement officers going to jail, and they wind up being in protective custody and administrative segregation because it is not safe for them to be in the general population. I'm not saying that's your client, but that's what prisons, one of the things prisons use ADSEG for. Now, they also use it for punishment, and I understand that argument. But if you've got somebody who's complained of excessive force, it would seem to be incumbent upon the prison to get that person out of the circumstances where he claims he suffered the excessive force. So what's illogical about what they did? In theory, with the right evidence in the record, under warrants. Why is that evidentiary? I'm not sure why you prove up in each case the wisdom of each policy. They just say, this is our practice. There's no evidence the practice wasn't followed. I'm taking your time. You'll still have a brief time for rebuttal. What's not right about that? Because as stated, what we're doing here today is sort of applying a post hoc rationalization to what we think or what evidence either way was there with regard to the logic or the reasoning behind the practice. There was none, and that's why it was not the implementation or exercise of the policy could not have reasonably advanced any legitimate correctional goal. And that's the point made with respect to the jury verdict issue. With the Court's permission, perhaps I could reserve the balance of my time. You'll still have two minutes for rebuttal. Good morning. May it please the Court, I am Misha Igra, and I represent six of the original twelve defendants in this case. This Court has already affirmed the judgment for the other six. In the reply brief, appellant whittles down this case to two issues. The denial of a motion for judgment on the pleadings and decisions made at summary judgment. This Court should affirm the denial of the Rule 50 motion for judgment as a matter of law because, first off, it wasn't appropriately briefed in the opening brief, but even if it had been, looking at the further excerpts of record, Mr. Garcia did not specify the law and evidence that entitled him to judgment as a matter of law. And even if he had adequately preserved it, judgment as a matter of law was still inappropriate because it can only be granted if no reasonable juror can find for the non-moving party. And here, in Garcia's case in chief, he testified, his brother testified, and inmate Rio testified that they all testified for each other in court. But he also presented the evidence from Sgt. Vasquez, Sgt. Wall, Lt. Zavala, Officer Chance, and he introduced their reports into evidence and Lt. Zavala's declaration in support of summary judgment. All of these showed the actions they took and why they took them. So at the point that Garcia made his Rule 50A motion, all of that evidence was in. And what did it show? And it showed that Sgt. Vasquez observed Mr. Garcia being erratic, and that he instructed his officers to document it. Lt. Zavala says that you can be placed in administrative segregation only if you're a lieutenant or higher. Officer Chance described the actions that they took when they placed him against the wall to try to calm him down and de-escalate the situation. And so all of this was before the jury. And the jury decided that defendants didn't retaliate. So a reasonable jury could make that decision, and that's why Rule 50. What would be the basis of the reasonable decision by the jury? So the jury was able to observe the demeanor of the officers. They were able to decide whether or not they believed that the reasons that they documented things were because they have an obligation to document those things, and not because they were trying to retaliate for a group appeal that Mr. Garcia and his brother had submitted at some other time. So I mean, is it basically that they were enforcing a policy they didn't have a choice about? Is that what you're saying? Well, they were required to document. As far as the policy goes, if we're right, that the decision maker must be at the level of the lieutenant or above. These officers had the obligation to report what they saw, and then it is Lieutenant Elias who made the decision to place Mr. Garcia in administrative segregation. These low-level officers don't have that ability, they don't have that authority, but they are required to document what they see, and that's what they did. So in my view, that's enough for you to win on the J-Mall issue. But I'd like to ask about the summary judgment issues. So he has a retaliation claim that he was put in solitary confinement because he made a complaint against the officers. And he's arguing that some of our case law, Jones and Rhodes, say that you need to give an individualized reason why this policy makes sense in this case. I think he's arguing, although he didn't actually say it as much today as in the briefs, that putting someone in ADSEG doesn't keep them from the officers. It might keep them from other prisoners, but it doesn't keep them from the officers who maybe are the ones who are going to beat him up more. Can you address that? Why is this a rational thing to put someone in solitary confinement when they have made a complaint against the prison? Well, first I'd like to clarify, he was not placed in solitary confinement. He was put in administrative segregation. What's the difference? Well, as it's reflected at excerpts of Record 243, he was placed on the reintegrated mixed exercise yard, Group B, for safety concerns. So he was placed on a yard for people who have safety concerns in the prison. He was not placed in solitary confinement. He seems to think that that was worse for him, though. Do you deny that it was worse for him in some way? Yes, Your Honor. You do deny that. So you're saying that, forget all this, it's not even an adverse action that could ever deter someone from making a complaint to be put in this different housing? Yeah, I think Turner v. Safley says that the placement in administrative segregation is one thing that inmates can expect from time to time. It's not a serious deprivation of a liberty interest, but that's in the due process context. I understand that he didn't want to be in administrative segregation. And so if someone reasonably wouldn't want to be somewhere, can't that be something that would deter someone from making a complaint? Well, no, Your Honor. It's not reasonable for him not to want to be there. So are there no differences in conditions between the two? Because, Your Honor, he submitted a grievance on July 27th. No, no, no. Okay, we'll talk about that. But I just want to know, what are the differences in conditions in this housing? He seems to be saying this is much worse for him. Now you seem to be denying that. But I'd like to know, what are the differences in being in this ad seg compared to where he was before? Well, I think the only thing in the record that it says is he wasn't able to house with his brother when he was in administrative segregation. But I don't think the record reflects that he was in worse conditions on the reintegrated mixed exercise yard group B for safety concerns versus the facility A3 yard. And I think that it's important, the people who got out on summary judgment are the people who retained him in administrative segregation. They did not place him in administrative segregation. And so at the time that Captain Suglich first met with Mr. Garcia. Did you argue in your brief, I'm sorry if I just forgot this, but did you argue in your brief that actually this housing isn't worse? We did not focus on the adverse action element. No, Your Honor. So why isn't this waived by the government or your clients? Well, at summary judgment, we need only prove one element is adverse action element. We did focus on the because. So it seems like maybe you're asking us to affirm on a ground that there's no record really for us to use to affirm on that ground. No, Your Honor. Again, only one element needs to be lacking and adverse action, whether or not it's satisfied, does not carry the day. I don't understand what you mean. So there are five elements to retaliation. Defendant's burden on summary judgment is to show a complete lack of adverse action. And that was just in response to your question, Your Honor. It was not something that we had argued in our brief. It's not something we need. So which factors should we look at? So let's look at the because of and the legitimate penological reason. The because of element in retaliation is a but for analysis under Lacey v. Maricopa County. But for this group appeal, would the officers have done what they did? Would the ICC, the Institutional Classification Committee, decided to retain him in administrative segregation? And what the ICC had before it, I think, is important. They had on July 27th, he submits a grievance that says, I've been subject to death threats. They have pointed a rifle at me and told me, we could kill you now and call it a suicide. This is against the officers, not against other prisoners, right? Correct, against the officers. He claims that a metal object was placed against the back of his head and it made him cry because he thought it was a gun and it turned out to be a flashlight. He claimed that all of these officers worked together in concert against him and that they roughed up him and his brother. Now the officer's story is... So how did putting him in ADSEG protect him from those officers? So by removing him from the yard, by removing him from where he claims that officers had brutalized him, he's being protected. It also allows... How? How? I mean, can those officers not... Is there evidence in the record that those whatever you're calling it, I mean, you're saying it's not solitary confinement, so whatever this ADSEG is, are those guards not allowed to go there? Is there evidence in the record that somehow this actually does protect him from those officers? Can you point me to something? Yeah, so there is evidence in the records where the officers have said where they are assigned to work and it's not an administrative segregation. And where is that in the record? Well, that's with each of their levels of testimony, in addition to their summary judgment, in addition to their declarations in support of summary judgment. But we also had these statements from officers saying he was belligerent, he was aggressive, and all we did is put him against the wall and pat him down. So they've got the inmate's story, very alarming, and the officer's story, which sounds kind of reasonable. That means we've got to have an investigation, and while that investigation is pending, it is reasonable for the officers, not the officers, it is reasonable for the Institutional Classification Committee to retain him in administrative segregation. Now, he was not in administrative segregation clear through, as was alleged in the reply brief. He was released on September 9th, but then he refused to sell me, and he was placed back in policy that if you refuse a cellmate, you may receive a rule violation report and be placed in segregated. But doesn't he also have evidence that the officers knew that he was not supposed to have that cell assignment? The officers who brought him to the cell? Well, there are a lot of names here, but whoever punished him, putting him back in ADSEG for refusing his cell assignment, doesn't he have evidence that at least some of those knew that he was not supposed to have that cell assignment? So it is Officer Smith who escorted him. Officer Smith testified that he didn't know about the grievances that Mr. Garcia had submitted. Mr. Smith... I think he alleges that Newman knew that he was not supposed to have that assignment. Newman is not one of the defendants, Your Honor. But wasn't Newman in the meeting, so at least it raises a fact issue about whether the other officers knew also? No. The Institutional Classification Committee was Contreras, Suglich, Cortez, and Dr. Huffman. And did they know the limitation on his housing? I mean, it was a pretty broad limitation. He couldn't live with very many people. And so at that point, when they made the decision to retain him in ADSEG after that, it seemed to me, and although I can admit there are lots of players and lots of facts, but it seemed to me they presumably or should have known that his initial refusal was justified based on the limitation that was in the record for him. And yet he was still kept in ADSEG for having refused an assignment where his refusal was justified. Yes. That may be the single hardest piece for me. What's the justification for that? So Lieutenant Zavala is the one who decided to place him in administrative segregation, not the Institutional Classification Committee. And Lieutenant Zavala has already had that judgment affirmed. So the Institutional Classification Committee looked at the... I mean, so on page 360 of the record, in a, I think, a sworn statement, the plaintiff says, during ICC hearing committee, Member Newman made the following statement for the record. I'm aware that he had these housing restrictions. I mean, it's a pro se statement, and it's a little incoherent, but it seems like he's saying that this committee, these officers, he names Newman, but that this committee knew that he had this restriction. Isn't that at least enough to raise a fact dispute, especially since, in fact, he was, he did have that restriction? That may be if Newman was one of the defendants, but he's not. But it doesn't matter if he's a defendant if he's in the room saying it, right? I mean, that doesn't matter. Well, and isn't this enough to make it at least unclear factually who knew what, when? So if you look at excerpts of record 251, we see that where the Institutional Classification Committee acted to release him back to the support waiting list, that was where he was released. But if you look at 249, you'll see that he claims that C.P. Newman, who was a Correctional Counselor III, knew about his housing restriction, who was present at that meeting. But there's no indication that Newman shared that with the committee. Now, what they do note is that he had an audio. Well, I mean, he says that in that, on 360, Plaintiff at least says that he believes that. And, I mean, so we know he, in fact, had this housing restriction. We know that Newman knew. We know that Plaintiff says Newman's at the meeting. So maybe you're going to be able to prove Newman wasn't at the meeting and didn't say it. But isn't that a fact dispute? No, Your Honor. What we have is records submitted by Mr. Garcia indicating that the ICC knew that he had a rule violation report pending for refusing a sound housing and delaying a peace officer. That's when he went to the shower and refused to come out because he didn't want to house with a Mexican cellmate. And that he had a prior rule violation for the same offense. And Mr. Garcia submitted into evidence a document that showed that for, this is in summary judgment, that for any repeated refusal of a housing assignment, you will go to the shoe. But if it's a valid refusal, that makes no sense. Well, but that's why, even though they recommended 60 days in administrative segregation, he was let out less than a month later because they had sorted things out and found him a place where he could be housed safely with an inmate with his specifications. So I'm almost out of time. Actually, you are out of time. The red light says you're over. Yes. So for all of the reasons that we've discussed, we ask that this Court affirm. Thank you. Thank you. Like I said, I'd give you a couple minutes. So we'll have rebuttal. If I could, and maybe because this issue infects both the challenge of the jury verdict and the summary judgment issues, I'd like to return to the policy. So the fact that there is a policy, and in the abstract we're challenging that policy, that is not this case. This policy is at issue in the context of a First Amendment case, in the context of a retaliation case. And so for that reason, whatever the cases that the government cites in its brief are not prisoner retaliation cases. They are cases more generically, where under a generic arbitrary and capricious standard, the petitioner or the plaintiff is challenging a policy. Here, what we're concerned about is First Amendment speech. And is First Amendment speech being chilled when there's no reasonable advancement of a legitimate correctional goal? And when you have that lens on, what the government needed to do was to put into the record evidence, A, either that the policy generally afforded the benefits that some of the COs stated in ipsy-dixy fashion. And why is it that the policy may not advance those goals? It's for the reasons that Judge Friedland said. What you've done is you've taken the victim, the alleged victim, and put him in confinement. And all of the prison guards still have access to him. But now he's confined. And so whatever worry or concern that you might have about prison— Is there evidence in the record about the conditions of this confinement and whether these officers can still get to him? And anything that we can learn about the conditions of where he actually was put? I think the government is correct that the level of administrative segregation, there are various levels. And he did not receive sort of what is known as the highest level. But there is not, as far as I'm aware, evidence in the record to suggest whether prison guards continue to have access to him or not. And the reason is simple. The reason is because the government did not make any attempt to support with any specific evidence or general evidence, generalized evidence that would say, for example, hey, in the past we've had prisoner retaliation or COs have acted against prisoners in the past when they've been in general population. And so therefore, based on this historical learning or knowledge, we've got to put them into solitary confinement. None of that. And then more specifically on the facts of Mr. Garcia's case, no specific findings there either. I think the argument that this was not an adverse action and that it didn't show any speech appears for the first time today. That was not in the summary judgment record before. It was not in the briefs on appeal. And she wasn't really trying to press it. So I— And so I just wanted to clean that up a little bit. And unless there are any other further questions from the panel, I will submit the other papers. Thank you. Thank both counsel for your helpful arguments. We thank you and your firm for taking this case on a pro bono basis. Thank you for your service to the government. We thank everybody. And that concludes argument calendar for today. We're adjourned.
judges: Fernandez, Clifton, Friedland